You may please the court. My name is Rick Spoonimore. With me at council table is David Simmons, group rep for the plaintiff appellant Thomas Dreiling. Between November 1st, 1999 and May 10th, 2000, defendant AOL acquired, then sold or hedged over a million shares of InfoSpace securities, generating profits in excess of $120 million. AOL did so at a time that InfoSpace's reported profitability was an illusion. It was an illusion that had been created through a concerted joint effort between Naveen Jain, InfoSpace's CEO, and AOL to manipulate or cook InfoSpace's books to hide tens of millions in expenses during that same period of time. It was done, as Mr. Jain emailed to AOL, in an effort to benefit InfoSpace's stock price. There is no issue that AOL generated huge profits by trading on the short swing. In addition, the evidence of fraudulent conduct is overwhelming. The district court concluded that our evidence was sufficient to show that Naveen Jain and AOL worked in concert to, quote, secretly influence the corporate affairs of InfoSpace by creating artificial revenues and earnings. They all, the district court also held that under Rule 16b, there is nothing you can do about that, correct? That is correct, and that gets, I think, to the heart of the question today, which is the interplay between Section 16b, Section 13d, and Rule 13d-5. What the district court did is to graft additional requirements onto Rule 13d-5 that don't exist in the plain language of the regulation. So that is the first issue I'd like to discuss. Well, let me talk to you a little bit about that. Sure. When we talk about Section 16b liability, we're only talking about liability that's applicable to insiders, correct? That is correct. And we're talking about a strict liability standard. In other words, we really don't have to find fault on those transactions. That is correct. And when we find that liability, therefore, it applies whether there's fault or not, and therefore, Galust says we should construe the statute narrowly. You construe the statute narrowly in the sense that- Well, now, isn't that what Galust says? Yes. We're to construe the statute narrowly. Correct. So if I'm going to find an insider, I've got to find a director, officer, beneficial owner of more than 10% of any class of equity security registered under the law. Correct. Without Jane, we would have nothing in this suit. Isn't that correct? That is correct, Your Honor. So we don't have any officer or director other than Jane. AOL didn't hold more than 5% of the stock. So unless we can find a particular agreement between Jane and AOL, we cannot give you relief. Isn't that correct? That's absolutely correct, Your Honor. And as I understand it, what is the standard of review in these cases? Standard of review in this particular case is de novo because- It's de novo as to the summary judgment. But as to the questions of fact, because this is the type of case it is, it's clearly erroneous, isn't it? I don't believe so. The question here is factual. Did Mr. Jane and AOL- Oh, but just a minute. When we read the cases that outline exactly what we're to do on this particular matter, even though it's a summary judgment because of the type of case it is, finding questions of fact, as I understand the law, is a clearly erroneous standard. I disagree with you, Your Honor, and here's why. Where's your case? Here's why. Give me a case. Well, the case I'm going to give you is- A case that says that it isn't a clearly erroneous standard. What I can give you, Your Honor, is the Morales v. Quintel case, which concludes that the question under 13d, and that's what we're talking about. 16b is not really the core issue because 16b says, with respect to insider status, you look to 13d and you look to Rule 13d-5. That is what determines whether Jane and AOL formed a group that made them insiders. Right, and 13d-5 requires that they agree to act together for the purpose of acquiring, holding, voting, or disposing of equity securities of an issuer, and that is what the district court found you did not. There was no evidence that that was the purpose. Now, on summary judgment motion, we construe the facts in the light most favorable to the non-moving party. We don't really make issues of fact. However, you are required to come forth with some evidence of this agreement, which the district court said you didn't. So my question to you is, what evidence do you have that demonstrates that whatever agreement the parties had with Jane wasn't just merely for the manipulation of the accounting books possibly, which might explain the Fifth Amendment, but that was for the purposes enumerated in section, I guess it's Rule 240-13d-5-b-1. You would, yes. The agreement between Jane and AOL was to rig the accounting of Infospace. Why did they do it? They did it so AOL could acquire warrants under the White Pages Agreement. Mr. Jane testified that if they could not... Didn't they already agree to the idea that AOL would obtain the warrants? They had agreed to that concept, but the whole deal was hung up. It was hung up by the fact that Infospace's auditors said that you had to require a significant cash penalty in the agreement to have it accounted for the way that Mr. Jane wanted it accounted for. AOL said that was a nonstarter. No way were they going to pay a penalty. So Mr. Jane emails Mr. Colburn of AOL at 4.30 in the morning saying he has some creative ideas to monkey around with the numbers to allow this agreement to go forward. They then rigged the deal to give the illusion of a cash penalty. Why did they do that? They did that because without that illusion of a cash penalty, there never would have been an agreement. Mr. Jane testified it was a deal breaker. If they couldn't account for the warrants based on the pre-IPO price, he never would have done the deal. The agreement itself is what gave AOL the warrants that they then sold in the short swing. So here are three issues to fall squarely within Rule 13.d.5. First, with respect to acquisition, the manipulation of the accounting was the last breaking of the dam that allowed the agreement to happen in the first place. What significance does that have? The significance is that it was an agreement for the purpose of acquiring securities. The agreement between the parties had to do with using AOL's subscribers to take advantage of your client's directory service. There are more than one purpose that is in the agreement. With respect to the legitimate business transaction, yeah, that's what InfoSpace and AOL are trying to do. Just in the normal course of business, why else would you get together? Well, you would get together because if you're an insider, such as Mr. Jane, and you had over half of the shares of the company, and you had a willing party, AOL, who was willing to manipulate the books to create artificial revenues and earnings. But that, as you just said, that was the last thing that happened in the negotiation of this deal, and otherwise Jane said it would be a deal breaker because his accountants had advised him that there had to be some sort of significant penalty if the requirements in the deal had not been met for it to satisfy gap practices. Well, correct. I mean, there was an intent originally to enter into a legitimate business deal. We don't dispute that. When the deal looked like it was never going to happen, Mr. Jane approached AOL, and they created a mechanism by which the deal could still happen, and AOL could acquire those warrants, that was nothing more than accounting fraud. Let me ask you this. What case stands for the proposition that Jane becomes a member of a group by participating in negotiations that result in the formation of the contract? Well, there's no case that stands for that proposition. Well, that's what you're really arguing. Because the deal was between Infospace and AOL, not Jane. That's correct, but the difference, Your Honor, is between the issue of capacity. Was Mr. Jane doing this fraud? I mean, let's separate the fraudulent aspect of the deal, the manipulation of the penalty, from the deal itself. There are two things going on here. One, there is the deal, which is legitimate, or at least started out that way. And secondly, there's the, when things got stopped, the improper fraudulent attempt to create the illusion of a penalty. Why aren't you suing under 10B-5? Because we're suing AOL. AOL is the one that sold. The fraud here was perpetuated, and Infospace's books were cooked. Now, is Info a publicly traded company, too, Infospace? Well, as AOL points out, under 10B, there's no aid or better liability. 16B allows us to go after AOL for its short-swing trades by virtue of the group theory under 13D. Is it a creative way of not pursuing a fraud action? It's a way of showing that Jane and AOL formed a group under 13D and 13D-5, which falls squarely within the regulation. And one of the whole purposes of Section 16B, as the SEC has recognized, is to address the manipulation by outsiders with insiders, that's the group theory, to manipulate issuer stock to allow profits on the short swing. This falls squarely. I mean, we can talk about creative or not creative. The bottom line is, does the alliance between Jane and AOL, not the legitimate business deal, but the deal that created the fraud, does that create a group between AOL and Jane? Let me ask you a question. Is there any evidence in this record, or what is the evidence, if there is, of coordination between Jane and AOL regarding the stock transactions? The coordination is as follows, and I should at least step back. I mean, I look very heavy to try to find some coordination or something in this record which would give it. I couldn't find it, so you've got to give me some help. I will give you some help. This is unlike a typical insider trading case, where there's not like an FDA rule that's going to come out some day, and the next day the stock is going to go up or down. It is a systemic misleading of the market over a period of time. And in this case, the zenith of that misrepresentation was the first two quarters of 2000. And in the first two quarters of 2000, Jane sold half of all the stock he owned in Infospace, and AOL sold virtually 100% or hedged 100% of their stock. It occurred in two clusters. And this, as the district court pointed out, was the zenith of Infospace's stock price. You're only suing AOL. It seems like all of the conduct that is fraudulent or may have been fraudulent is on the part of Jane. I think, indisputably, there is fraudulent conduct on the part of Jane. But Jane was only able to do this by coordinating with AOL and by AOL's explicit agreement to do this. All right. What is the evidence of coordination? I think that's the judge in the pastorium. Yes, the evidence of... That's the problem. I didn't see it. Here's the evidence. The evidence, and remember, under Rule 13d-5 and Rule 13d, it doesn't have to be a sign-sealed, king-wax kind of agreement. Okay. The coordination is the fact that they agreed to manipulate Infospace's accounting. Jane did it to benefit himself. The question is one of intent. Was Jane doing it to help Infospace or himself? What's the evidence? What's the evidence of coordination? Yes. The evidence of coordination are the e-mails between Mr. Jane and AOL setting forth the fraud that they then implemented. It is e-mails that followed the implementation of the fraud where they... The problem that comes in that, I mean, I looked all around to find some way to get after AOL or anybody else on the fact that one could act secretly to influence affairs by creating artificial revenue and earnings, and I can't find anything under 16b for that. I can find other places you can go to get that, but you're here under 16b, and now you're coming back with the same allegations as to everything else. My worry is this. If you want to go under 16b, I would allege something 16b can help you do, and I've got to find some overt act other than what you can't get under 16b to get you there. That's my question. Here's my response. Rule 13d5b1, I think, provides the answer. This is the regulation. It says, when two or more persons agree to act together for the purpose of acquiring, holding, or voting or disposing of shares, then they are deemed, that's the consequence, to beneficially own each other's shares. Is the fraud, is the agreement between Jane and AOL to print InfoSpace's books, is that an agreement to act together for the purpose of acquiring, holding, or voting? It is. It's an agreement for the purpose of acquiring. Why? Because without the fraud, the agreement never would have happened, that's Jane's testimony, and the warrants never would have vested, and AOL would never have gotten a single share. Holding and disposing. By cooking the books of InfoSpace, Jane was allowed to tout InfoSpace's profitability at a time when InfoSpace, excuse me, when Jane and AOL themselves, and only themselves, knew that those representations were flat out wrong. That allowed them to hold their shares when the market was misrepresented and then to sell those shares, dispose of them in the context of the rule, into a market that had been misled. That is an agreement to act together for the purpose of acquiring, holding, or disposing of securities. I see I only have 30 seconds left, so unless there are other questions I'll reserve that minimal time for my rebuttal. All right, thank you. Thank you. Thank you, Judge Wardlaw. Kannon Shanmugam of Williams & Connolly for Appley AOL. May it please the Court, Section 16B of the Securities Exchange Act imposes strict liability on any person who owns more than 10% of a company's stock and thereafter engages in short-swing trading. For purposes of meeting the 10% threshold,  that any person who owns more than 10% of a company's stock that a person is deemed to be the owner of another person's stock where the two persons agree to act together for the purpose of acquiring, voting, holding, or disposing of the company's stock. In order to meet that requirement, the parties must agree to take some collective action regarding the company's stock itself, not merely some action that may have an effect on the company's share price. In this case, appellant at most presented evidence that AOL assisted Infospace's CEO, Naveen Jain, in accounting improprieties. Appellant presented no evidence that the parties agreed to act together to take some collective action regarding Infospace's stock. For that reason, the District Court correctly concluded that there was no genuine issue of material fact as to whether AOL should be deemed to be the owner of Jain's stock, and its decision to enter summary judgment should therefore be affirmed. This accounting scheme or manipulation which the District Court found, that did have the result of artificially enhancing Infospace's revenues and earnings, and therefore the value of the stock warrants that AOL had. Isn't that right? Well, I think we would dispute the proposition that these were in fact accounting improprieties, and the question of whether this was appropriate accounting treatment is itself quite complicated. But I don't think we would dispute the fact, Judge Wardlaw, that it was beneficial to Infospace to account for the warrants in this manner. Was it also beneficial to AOL? Beneficial to AOL that they were treated in this manner? I suppose that that's true, Judge Paiz, in the sense that if they had been accounted for in the alternative sense, namely if the stock had been valued at the time that the warrants had vested, it would of course represent a larger expense on Infospace's books. We certainly don't dispute that proposition. But the fundamental proposition here is that there is simply no collective action with regard to the stock itself. Appellant's theory here is a quite simple one, and we don't dispute the fundamental factual propositions that underlie it. Appellant's theory is that but for the alleged accounting improprieties, AOL would have been unable to acquire Infospace stock. But in the 40 years since Section 13D was added to the Securities Exchange Act, there is simply no case in which a court has found Section 16B liability or found the existence of a group under Section 13D in remotely similar circumstances. The Romeo and Die Treatise on Section 16B says that there are something on the order of 55 reported cases involving the question of the circumstances under which a person can be deemed to be the owner of another person's stock under Section 13D and therefore Section 16B. And in looking at those cases, there are really three factual circumstances on which courts have relied in finding the existence of a Section 13D group, and none of those factual circumstances is present here. The first is the existence of an express agreement between the parties governing the disposition of stock, and as Judge Wardlaw pointed out earlier in the argument, there is obviously no evidence here of an express agreement between AOL and Jane. The other two categories of cases are cases in which courts have looked to other evidence to infer the existence of a necessary agreement, and those are cases in which the parties either engage in coordinated trading of stock or cases in which the parties possess some common further objective with regard to the stock. And with regard to the issue of coordination, as I think was clear from the earlier colloquy, there is simply insufficient evidence of coordination here. Indeed, there is evidence regarding the parties' conduct that belies the contention that there was in fact an agreement, and this really goes to the part of my friend Mr. Spoonamore's argument relating to the disposition and sale of stock. Here, AOL actually engaged in only one outright sale of stock, the sale on March 15, 2000. That was a sale that took place something like six weeks from any sale made by Jane, but AOL simply did not engage in any further sales. All that AOL did was to enter into these so-called cashless collars, and the way that those collars work is essentially to reduce the risk to AOL from any fluctuation in stock. And indeed, at the end of the period of time during which those collars operate, AOL continued to retain the InfoSpace stock. So if it were really true that AOL and Jane had entered into some agreement to pump up the price of InfoSpace stock and then profit therefrom, it would have been a very peculiar way for AOL to have done that. One would more naturally expect that AOL simply would have sold the entirety of its holdings, and AOL did not do that. And with regard to... Can I ask you just a question on another district court finding? The judge said that the only persuasive evidence offered by Mr. Dreiling relating to the alleged agreement between Mr. Jane and AOL is the AOL executive's invocation of their Fifth Amendment rights when questioned as to this topic. I'm not sure what he meant by that. I know that he could properly draw an inference, but what is the inference to be drawn from that? Well, at most, Judge Wardlaw, it would be an inference that AOL, in fact, assisted Jane in the accounting improprieties. That was, of course, the subject of the questioning of Colburn and Keller. And for purposes of this appeal, we do not disagree with the district court's determination on page 16 of the record excerpts that there was, in fact, some evidence from which it could be concluded that accounting improprieties had occurred. We would, of course, vigorously dispute the underlying proposition. But our fundamental submission here is that, as a matter of law, that is simply insufficient to give rise to a group under Section 13. So for purposes of the Fifth Amendment issue, the critical point, Judge Wardlaw, is that there was simply no reason to draw an inference on the ultimate question here, namely whether there was an agreement to act together for one of the requisite purposes. And so even if a Fifth Amendment inference were drawn here, it would not aid appellant because all that it would do is buttress whatever evidence there was in the record with regard to accounting improprieties. We also go on to point out in our brief, as you will be aware, that there is some reason to doubt the loyalty of these former employees to AOL. And what we're talking about here, after all, is really drawing an adverse inference from the testimony of non-parties, to be sure, former employees. And so even if the testimony had been on the ultimate issue here, I think there would be good reason to question whether it would be appropriate to draw an adverse inference. And after all, the decision on whether to draw an adverse inference is a discretionary one. You know, in summary judgment, it doesn't take a lot to raise a genuine issue of tribal fact, right? Well, it does take some evidence. Well, there's got to be some evidence. And they argued just before, counsel argued just before he sat down what he thought the evidence could show. Yes. And he says, you know, there is some evidence here. There was this agreement, this tentative agreement. It didn't work out unless they made these changes to it. And they did this knowing they were going to pursue this accounting manipulation, whether it was proper or not under GAF. But they agreed to this, and there's evidence in the record that they knew about it, and they went along with it. And he says, well, from that, the purpose of all that was, even though there was this other bigger agreement about the business deal, there was this, one could infer from that, that they had an agreement to ensure that AOL would be able to acquire and to hold info stock for the purpose of later selling that stock at a higher price. Yes. And reaping the benefit. And to be clear. At a higher price. And to be clear, Judge Pias, we're not disputing the proposition that the accounting treatment here was the but-for cause for the execution of the ultimate white pages agreement. Our fundamental submission is that that is simply insufficient as a matter of law. And let me try to explain. How about could you have a side agreement? A side agreement between AOL and Jane. And Mr. what's his name? Jane. Jane. Well, it certainly is true that there could be an agreement between AOL and Jane. I think the only caveat would be that we agree with Judge Robart that were there to be such a side agreement for it to suffice under Section 13D, the insider would have to be acting in some sort of individual capacity rather than an official capacity. But, again, the but-for causation theory that Appellant explicitly propounds both in his brief and here today at oral argument is simply insufficient as a matter of law. There is no case in which a court has held that that is sufficient. And tellingly, when Judge Robart asked Appellant what case he would cite for the proposition that it was sufficient, Appellant cited three cases, none of which Appellant now relies on before this court. And, again, when one looks at the factors that courts have recognized in determining that a group, in fact, exists, none of those factors is, in fact, present in this case. And here, with regard to the acquisition theory, I think the only other thing that I would say is that, number one, there is no claim of an agreement to take collective action regarding the stock itself. And we really do believe that that is what the language of Rule 13d5b1 requires. And there's also no evidence here of a shared purpose to acquire stock. One of the oddities of the acquisition theory here is that it really relates to the acquisition of stock by only one of the parties because Jane, of course, already possessed stock. So in order to recognize Appellant's theory, I think one would really have to read the language for the purpose of acquiring stock to mean for the purpose of enabling one party to acquire stock. And I'm unaware of any case under Section 13d in which courts have recognized the existence of a group in similar circumstances, at least absent some common further objective, such as the objective of obtaining control. I see that my time is short, and so I think there's only one other affirmative point I'd like to make before I sit down, and that is that recognizing the existence of a group for purposes of Section 16b under these circumstances really would threaten to blow the covers off Section 16b liability. And that is because the conduct that is alleged here is really effectively the equivalent of aiding and abetting securities fraud. And under Section 10b, of course, a claim on an aiding and abetting theory is not cognizable. The Supreme Court so recognized in the Central Bank case some 15 years ago, and it essentially reiterated that holding in its recent Stone Ridge decision. And so this is really an effort to plead a Section 10b claim under another name, and recognizing liability under these circumstances would greatly expand the scope of Section 16b. Indeed, it would cast some doubt on the validity of the SEC's incorporation of the requirements of Section 13d, insofar as a person acting under these circumstances really could not meaningfully be said to be the beneficial owner of the other person's stock. And it is really for that reason and the other reasons we articulated in our briefs and today at oral argument that we believe that the summary judgment decision here should be affirmed. Thank you. Thank you very much. AOL Council, at least twice in this presentation, mentioned the following. AOL would not have been able to acquire InfoSpace without the accounting improprieties. That is the acquire theory. It was, I think best put, it was a side deal that traveled alongside with a legitimate business deal. It was a side deal between Mr. Jane and AOL to manipulate the accounting in a way that only they knew to enable AOL to get the warrants by virtue of the agreement. Without the accounting manipulation, without the agreement to act together between Jane and AOL, InfoSpace, excuse me, AOL never would have acquired the warrants. That is not disputed by AOL. What did Jane get out of that? Jane got out of it the misrepresentation to the public in 1999 and 2000 as to InfoSpace's profitability. When he knew it was not profitable, it allowed him to sell into that market some $200 million worth of shares at a time the market did not know the true nature of the relationship between InfoSpace and AOL. In other words, this was an agreement between Jane and AOL that allowed AOL to acquire the shares in the first place. It allowed Jane and AOL to hold those shares while the market was misrepresented. And then it allowed them to dispose of those shares within a six-month period, each earning hundreds of millions of dollars. That fits squarely within 13D5B1. It is an agreement that falls within that section. And for that reason, we believe that the trial court erred in dismissing our case, should be remanded for trial because a reasonable jury could find that there was coordination between Jane and AOL for the purpose of acquiring, holding, and disposing of InfoSpace securities. All right. Thank you, counsel. Thank you. Drawling v. AOL is submitted.
judges: Wardlaw, Paez, Smith N. R.